UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BADEN SPORTS, INC.,

           Plaintiff,

v.

KABUSHIKI KAISHA MOLTEN (DBA MOLTEN CORPORATION) AND MOLTEN U.S.A., INC.,

           Defendants.

No. C06-0210

ORDER REGARDING CLAIM CONSTRUCTION

This matter comes before the Court on the parties' claim construction briefing. (Dkt. Nos. 80-81, 90-91). On January 19, 2007, the Court held a Markman hearing[1] regarding construction of the at-issue claim terms. Having considered the parties' briefs, the documents submitted in support thereof, and the arguments at the Markman hearing, the Court orders as follows:

    (1)    "Raised seams" means "a piece of material that is at a higher position that the sponge layer in the basketball."

    (2)    "Strips of seam material" means "strips of seam material."

---

[1] Markman v. Westview Instr., Inc., 517 U.S. 370 (1996)

ORDER - 1

# BACKGROUND

Baden develops, manufactures, and sells basketballs. In the mid-1990s, Baden developed a new game-quality basketball that is "cushioned" or "padded." On May 12, 1995, Baden filed a patent application in the United States Patent and Trademark Office (USPTO) on certain features of its padded basketball design. The USPTO granted Baden a patent on June 10, 1997: U.S. Patent No. 5,636,835 (the '835 patent). On May 22, 1997, Baden filed a continuing patent application. The USPTO subsequently granted Baden a second patent regarding this same design on February 8, 2000: U.S. Patent No. 6,022,283 (the '283 patent).[2]

The patented basketball is designed with a "sponge rubber" or "cellular sponge layer" underneath both the exterior panels of the basketball and the seams. The '835 patent explains that this design gives the ball a "soft feel" and a "truer bounce", and allows the ball to wear better and maintain its spherical shape more easily than a conventional ball.

Baden alleges that Defendants recently introduced several basketball models in the United States market that copy Baden's patented basketball design. Baden alleges that Molten's basketball design infringes on Baden's '835 patent.

# DISCUSSION

**A.   The Law of Claim Construction**

The Court has the sole responsibility for construing patent claims. <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 372 (1996). The Court construes claims purely as a matter of law. <u>Cybor Corp. v. FAS Tech., Inc.</u>, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (applying de novo review to all claim construction issues, even "allegedly fact-based questions"). In practice, executing the

---

[2]   Although Baden's original complaint alleged infringement of the '283 patent, Baden has amended its complaint to dismiss the claims based on the '283 patent. In a separate order, the Court grants Baden's request to amend its complaint. The Court therefore only considers the '835 patent in its analysis.

ORDER - 2

Markman mandate means following rules that rank the importance of various sources of evidence of the "true" meaning of claim terms.

The Federal Circuit's most recent exposition of the claim construction rules came in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Although the case focused on the role of dictionaries in claim construction, it also reviewed the claim construction process.

Intrinsic evidence, which includes the patent and its prosecution history, is the primary source from which to derive a claim's meaning. Id. at 1314. The court's task is to determine the "ordinary and customary meaning" of the terms of a claim in the eyes of a person of ordinary skill in the art on the filing date of the patent. Id. at 1313 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In its review of intrinsic evidence, the court should begin with the language of both the asserted claim and other claims in the patent. Id. at 1314; see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[C]laim construction analysis must begin and remain centered on the claim language itself.").

The court must read claim language, however, in light of the remainder of the patent's specification. Phillips, 415 F.3d at 1316 ("[T]he specification necessarily informs the proper construction of the claims."). The specification acts as a "concordance" for claim terms, and is thus the best source beyond claim language for understanding claim terms. Id. at 1315. The inventor is free to use the specification to define claim terms as she wishes, and the court must defer to the inventor's definitions. Id. at 1316 ("[T]he inventor's lexicography governs."). The court should "rely heavily" on the specification in interpreting claim terms. Id. at 1317. The court should not, however, commit the "cardinal sin" of claim construction – reading limitations from the specification into the claims. Id. at 1320 (citing SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001). Although a court should limit the meaning of a claim where the "specification makes clear that the invention does not include a particular feature," the court must not

ORDER - 3

read "particular embodiments and examples appearing in the specification" into the claims unless the specification requires it. Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1571 (Fed. Cir. 1988).

Although the patent's prosecution history is also intrinsic evidence, it is "less useful for claim construction purposes." Id. at 1317. As the prosecution history documents an invention's evolution from application to the issuance of the patent, it usually "lacks the clarity of the specification . . . ." Id. The prosecution history is useful, however, in determining when an inventor has expressly disavowed certain interpretations of her claim language. Id.

Finally, the court can consider extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." Id. at 1317 (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995)). For a variety of reasons, extrinsic evidence is usually "less reliable than the patent and its prosecution history" as a source for claim interpretation. Id. at 1318. The court thus need not admit extrinsic evidence, but may do so in its discretion. Id. at 1319.

As the Phillips court put it, the "inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." 415 F.3d 1303, 1314. However, the court can only rely on dictionaries or on expert testimony from a person of skill in the art when no answers are apparent from the intrinsic evidence. Following Phillips, the starting point for claim construction is the "widely accepted meaning of commonly understood words." Id. The court should then look first to the claims, then to the specification, and finally to the prosecution history to clarify that meaning.

**B.     Raised Seams**

The parties dispute the meaning of "raised seams." This term is found in claim numbers 1, 3, and 5 of the '835 patent. The dispute focuses on what the seams are raised in relation to. Baden argues that the seams are raised in relation to the underlying sponge layer of the basketball. Baden's

ORDER - 4

proposed construction is: "a piece of material that is at a higher position than the sponge layer in the basketball." Molten argues that the seams are raised in relation to the exterior skin panels, such that the raised seams extend to the height of the outer edges of the two adjacent skin panels. Molten's proposed construction is: "a raised central portion 22 of seam material 20 fills the space between the outer edges 24, 26, of two adjacent skin panels."[3] The Court concludes that Baden has provided the more accurate construction.

The Court looks first to the ordinary meaning of the claim terms and then reads those terms in the context of the other claims in the patent. The '835 patent claims, in part, "a plurality of raised seams, defined by strips of a seam material, wherein the sponge layer underlies the raised seams, and further, the inner carcass portion, the cellular sponge layer and raised seams together define a ball carcass." (Claim 1). Considered in isolation, the words "raised seams" suggest seams that are heightened in relation to something else. Thus, considered in light of the ordinary meaning of the words, Molten's construction does not make sense. Molten suggests comparing the height of the seam to the exterior skin panels. But under Molten's construction, the seam is not heightened in relation to the exterior skin panels, but "<u>flush with</u> the upper surfaces of the adjacent skin panels." (Emphasis added.) Molten's construction would therefore eliminate the ordinary meaning of the word "raised."

Baden's proposed construction is consistent with the '835 patent claims. As explained in claims 1 and 3, the "inner carcass portion, the cellular sponge layer and raised seams together define the ball carcass." Thus, before the skin panels are attached, the ball carcass is composed of an inner carcass, encircled by a cellular sponge layer, with seams extending upwards from and on top of the

---

[3]   The numbers refer to the identifying numbers in Fig. 3 of Baden's '835 patent.

ORDER - 5

cellular sponge layer. This phraseology suggests that the seams are "raised" regardless of the height or positioning of the exterior skin panels; they are "raised" in relation to the underlying sponge layer.

Molten points to other claim language to support its construction of the term. Specifically, Molten points to that portion of Claim 1, which states, "wherein . . . each strip of seam material comprises: a raised portion positioned between spaced, outer edges of the skin panels on opposite sides of the raised portion." And Molten points to Claim 5, which states, "the raised seams defining the boundaries of skin panel placement areas . . . each strip of seam material includes a raised portion." But this claim language describes the horizontal position of the seams in relation to the exterior panels, not the vertical position. This language explains that the raised portion of the seams are exposed between and touch the exterior panels. It does not describe the height of the seam vis-a-vis the adjacent exterior skin panels.

In addition, Molten points to language in the specification of Baden's '835 patent that refers to the raised seams "exposed between the edges of exterior skin panels" (col. 1, ll. 11-12); "the boundaries of the exterior skin panels [being] defined by the raised seams" (col. 2, ll. 29-31); and the "raised central portion 22 of the seam material 20 fill[ing] the space between the outer edges 24, 26 of two adjacent skin panels 28, 30" (col. 3, ll. 32-34). Like the claim language, these specifications do not describe the height of the seam compared to the adjacent exterior skin panels, but rather, the horizontal position of the seam in relation to the skin panels.

Finally, Molten points to prior art mentioned in the prosecution of the '835 patent. But Molten has not cited to where this prosecution history is in the record. And even if the Court considered the relevance of this prior art (the Anderson patent, U.S. Patent No. 3,863,923), which itself refers to the Henderson patent (U.S. Patent No. 3,508,750), the Court is not persuaded that Anderson or Henderson affect the meaning of "raised seams" in Baden's '835 patent. As explained by Molten, Anderson, in describing the Henderson patent, discloses that the diameter of the exterior

ORDER - 6

skin panels constitute the diameter of the ball, as defined by the elevated raised seam. Not only is this evidence attenuated, it does not explain that the Henderson seam must be "raised" in relation to the exterior panel; it only explains that in the Henderson design, that seam was designed to be the same height as the highest portion of the exterior skin panel. This prior art thus provides little guidance in understanding the meaning of "raised seams" in Baden's '835 patent.

The ordinary meaning of the term and the claim language support Baden's construction of "raised seams." Baden's construction is also supported by Figures 1, 3, and 5 of the '835 patent, which all indicate a seam with a raised portion at a height above the underlying sponge layer. And finally, the patent specifications support Baden's construction. The specifications describe how the ball is molded: In the mold, the carcass is cured under heat, the heat causes the foaming agent to expand the foamable sections into a single, uniform cellular sponge layer, and "[t]he seam strips are molded at the same time, thereby creating the raised seams familiar to conventional basketballs." (Col. 4, ll. 25-34). This specification suggests that the seams are "raised" regardless of the height of the exterior skin panels; rather, their raised characteristic explains the seams' height in relation to the underlying foam section.

Because the ordinary meaning of the words, the claim language, and the patent specifications are all consistent with Baden's proposed construction, the Court adopts Baden's proposed construction of the term "raised seams."

C.  **Strips of seam material**

The parties dispute the meaning of the term "strips of seam material." This term is found in claim numbers 1, 3, and 5. Baden argues that "strips of seam material" should be construed as "strips of seam material." Molten suggests that "strips of seam material" should be construed as "raised seams having a raised portion which is filled with an underlying foam layer" or "a seam having an outer surface formed by thin rubber strips and an inner portion of foam attached to the strips."

ORDER - 7

Molten is arguing that Baden's patent is limited to a design with strips of seam material with a raised portion that is not solid underneath, but rather, has foam underneath and within the raised portion of the seam. The Court does not agree that Baden's patent is limited in this way.

The Court agrees with Baden that the ordinary and plain meaning of the words "strips of seam material" is "strips of seam material". Stated differently, in isolation, this term means a narrow piece of material that constitutes a seam. This interpretation is supported by the claims themselves. The term is used throughout the claims. For example, in Claim 1, "each strip of seam material comprises: a raised portion positioned between spaced, outer edges of the skin panels on opposite sides of the raised portion; and flange portions extending away from opposite sides of the raised portion." And Claim 1 states "a plurality of raised seams defined by strips of a seam material, wherein the sponge layer underlies the raised seams." Claim 3 states "a plurality of raised seams defined by strips of a seam material, wherein the strips of seam material are bonded directly to the cellular sponge layer and the sponge layer underlies the strips of seam material . . . ." Claim 5 states "a plurality of raised seams defined by strips of a seam material attached to the cellular sponge layer . . . and, wherein, each strip of seam material includes a raised portion positioned between spaced, outer edges of the skin panels on opposite sides of the raised portion . . . ." In all of these contexts, the most straightforward meaning of "strips of seam material" is "strips of seam material", or a narrow piece of material that constitutes a seam.

Molten's construction expands the term itself to include a larger portion of the claim. Molten's proposed construction of "strips of seam material" is really a proposed construction of "strips of a seam material, wherein the sponge layer underlies the raised seams". (Claim 1). But even considering that phrase as one term, the Court is not convinced that the term means "raised seams having a raised portion which is filled with an underlying foam layer." Molten's construction is not

ORDER - 8

supported by the claim language. None of the claim language discusses the raised portion of the seam being "filled" with foam; instead, its discusses the sponge or foam layer <u>underlying</u> the seam strip.

Molten's construction does find support in Figure 3 of the '835 patent. That figure shows a seam with a raised portion, and within that raised portion is foam. But the claims themselves do not contain language that limits the design to that particular graphic representation. The Court will therefore not limit the claims to the graphic representation in Figure 3. <u>See</u> <u>Constant v. Advanced Micro-Devices, Inc.</u>, 848 F.2d 1560, 1571 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims.").

Molten also makes arguments regarding the prosecution of the '283 patent. But the Court is not considering the '283 prosecution history because Baden has amended its complaint to eliminate its cause of action based on that patent. And even if the Court were to consider the prosecution history of the '283 patent, the Court does not agree with Molten that the '283 prosecution history limits the patent to Molten's proposed construction. The prosecution history makes clear that Baden's '835 patent is limited to a design with a sponge layer under both the exterior panels and the rubber seams. The prosecution history presented by Molten does not suggest that Baden's '835 patent is limited to seams filled with foam.

ORDER - 9

## CONCLUSION

Because Baden's proposed construction of both of the disputed claim terms is supported by intrinsic evidence, the Court adopts Baden's proposed construction of "raised seams" and "strips of seam material."[4]  "Raised seams" means "a piece of material that is at a higher position than the sponge layer of the basketball."  "Strips of seam material" means "strips of seam material."

The clerk is directed to send a copy of this order to all counsel of record.

Dated: January 26th, 2007.

Marsha J. Pechman
United States District Judge

---

[4] The Court did not rely on any extrinsic evidence in construing these terms.

ORDER - 10