UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BADEN SPORTS, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>KABUSHIKI KAISHA MOLTEN (DBA MOLTEN CORPORATION) AND MOLTEN U.S.A. INC.,<br><br>                Defendants. | No. C06-210MJP<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOLTEN'S MOTION FOR SUMMARY JUDGMENT RE: LANHAM ACT CLAIMS |

This matter comes before the Court on Defendant Molten's motion for partial summary judgment on Baden's Lanham Act claims. (Dkt. No. 172.) Plaintiff Baden Sports opposes the motion. (Dkt. No. 182.) Having considered Defendants' motion, Plaintiff's response, Defendants' reply (Dkt. No. 187), all documents submitted in support thereof, and the record herein, and having heard oral argument on the motion, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

**Background**

The Court has previously described the facts of this case. Defendants Kabushiki Kaisha Molten and Molten U.S.A. (hereinafter "Molten") and Plaintiff Baden Sports are competitors in the sports ball business. In the 1990's, Baden developed and patented a new game-quality basketball that is "cushioned" or "padded." (Third Amended Complaint [hereinafter Compl.] ¶ 10.) The basketball is "padded" by manufacturing it with a cellular sponge layer that underlies the basketball's exterior skin panels and seams. (Id.) Baden alleges that Molten recently introduced several basketball models into

ORDER - 1

1  the U.S. market that copy Baden's technology. (Compl. ¶ 15.) Baden alleges that Molten's "Dual
2  Cushion Technology," which is incorporated into numerous Molten basketball models, duplicates the
3  seam and cellular sponge layer construction of Baden's patented design.

4  Molten has a basketball sponsorship agreement with FIBA, the Federation Internationale de
5  Basketball, which purports to be the world governing body for basketball that controls and regulates
6  international basketball competition. Some of Molten's allegedly infringing basketballs are sold
7  directly to consumers through FIBA's online store. Molten has presented evidence that the FIBA
8  store is operated by a French company named Fanavenue. (Dkt. No. 172-2, An Decl., Ex. A.) It is
9  undisputed that the Molten basketballs sold to U.S. consumers through the FIBA website arrive in the
10 U.S. without any marking of the basketball's country of origin.

11 Molten advertises its "Dual Cushion Technology" as its own innovation. For example, in an
12 article in FIBA Assist Magazine, Kiyoaki Nishihara, a Molten employee and the named inventor on
13 several of Molten's patents, describes how Molten developed its "project to create a new design for
14 the basketball." The article describes "Molten's innovative proprietary Dual-Cushion technology."
15 The article states that the technology incorporated in the new basketball, including the dual-cushion
16 technology and the exterior design, is "[t]echnology that only Molten can create." (Dkt. No. 55-11,
17 Kaser Decl., Exh. J.) Third-party retailers, such as amazon.com also advertise for sale Molten
18 basketballs that feature "Innovative Molten Dual Cushion Technology." (Id., Ex. G.) Baden alleges
19 that such advertising is false.

20 Baden's Third Amended Complaint contains two Lanham Act allegations. First, Baden
21 alleges that Molten is liable for importing basketballs into the United States without marking the
22 country of origin. Baden alleges that this is a deceptive and misleading representation of fact that
23 misrepresents the geographic origin of Molten's basketballs. Second, Baden alleges that Molten is
24 making false or misleading statements of fact in its commercial advertising. Baden alleges that
25 Molten is falsely advertising that its basketballs were designed by a prominent Italian design company.
26 (Compl. ¶ 46.) And Baden alleges that Molten is falsely advertising that its "Dual Cushion

ORDER - 2

Technology" is its own exclusive, proprietary, innovative technology when, in fact, Molten copied Baden's technology. (Compl. ¶¶ 47-48.)

In March, the Court denied Molten's motion for summary judgment on Baden's Lanham Act claims. (See Dkt. No. 115.) The Court denied Molten's request to dismiss Baden's geographic misrepresentation claim because "failure to mark the country of origin is actionable under the Lanham Act" and because "Baden has alleged and presented evidence suggesting that Molten basketballs imported into the United States through the FIBA online store are done so without any country of origin marking." (Id. at 7.) And the Court denied Molten's request to dismiss Baden's false advertising claim because it found that Baden had raised genuine issues of material fact on that claim. (Id. at 8.) In this motion, Molten again seeks summary judgment on Baden's claims for false advertising and geographic misdescriptiveness.[1]

**Discussion**

I. **Standard on Summary Judgment**

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the opposing party must set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

II. **False Advertising**

Molten argues that Baden's false advertising claim is barred by the Supreme Court's decision in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003). Baden argues that it has

---

[1] The Court notes that Molten has not moved on Baden's claim that Molten falsely advertises that its basketballs were designed by a prominent Italian design company. (See Compl. ¶ 46.)

ORDER - 3

stated a viable false advertising claim under § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

### A. Section 43(a) of the Lanham Act

Baden has brought claims under section 43(a) of the Lanham Act. That section provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Thus, § 43(a) contains two distinct prongs — a "trademark" or "false association" prong under subsection (1)(A) and a "false advertising" prong under subsection (1)(B).

### B. Dastar Corp. v. Twentieth Century Film Corp.

Molten argues that Baden's false advertising claim is barred by the Supreme Court's decision in Dastar Corp. v. Twentieth Century Film Corp., 539 U.S. 23 (2003). The facts of the Dastar case involve a television series — "Crusade in Europe" — based on General Dwight D. Eisenhower's World War II memoirs. Dastar, 539 U.S. at 25-26. Twentieth Century Fox held the exclusive television rights to the memoirs; those rights were granted to a Fox affiliate, and Fox arranged for Time, Inc. to produce the television series. Id. The television series combined a soundtrack based on a narration of Eisenhower's book with various film footage, including footage from the U.S. Army, Navy, and Coast Guard. Id. at 26. The copyright on the television series expired in 1977. Id. In 1988, Fox licensed New Line Home Video to make and distribute videotapes of the television series. Id. Defendant Dastar then obtained tapes of the original "Crusade" television series, edited the content down to about half the length, and created some new content such as a new opening

ORDER - 4

1  sequence, credit page, and closing page. Id.  Dastar entitled the resulting videotapes "World War II

2  Campaigns in Europe." Id.  In its advertising and packaging, Dastar did not mention the "Crusade in

3  Europe" television series or the Eisenhower book. Id. at 27.  Dastar advertised that its videotapes

4  were "Produced and Distributed by Entertainment Distributing," a Dastar company. Id.  Screen

5  credits stated "Dastar Corp. Presents" and "an Entertainment Distributing Production" and listed as

6  producers employees of Dastar. Id.

7  Fox and New Line sued Dastar both for infringing the copyright in the original Eisenhower

8  book and for violating Lanham Act § 43(a)(1) by "reverse passing off."[2] Id.  Plaintiffs alleged that

9  Dastar made a false designation as to the origin of the goods it sold by failing to give credit to Fox

10 and by designating Dastar, not Fox, as the producer of the Dastar "Campaigns" video. Id.  But the

11 Supreme Court held that there was no violation of Lanham Act § 43(a)(1)(A) because "origin" in that

12 part of the statute denotes only the manufacturer or producer of the physical goods and not the

13 creator of the intellectual property embodied in those goods:

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.

17 Id. at 37.  Thus, because Dastar "produced" the tangible copies of the derivative video, it was the

18 "origin" of the physical goods.

19 Dastar's holding means that § 43(a)(1)(A)'s prohibition on false claims of origin can not be

20 extended to false claims of the creation of inventive or communicative works. See J. Thomas

21 McCarthy, McCarthy on Trademarks and Unfair Competition § 27:77.1 (4th ed. 2007).  Thus,

22 "reverse passing off" claims brought under § 43(a)(1)(A) cannot be based on allegedly false claims of

23 authorship, invention, or creation. Id.  But the Dastar Court noted that its decision did not preclude

24 all claims under the "false advertising" prong of § 43(a)(1)(B).  The Court hypothesized:

---

[2] "Passing off" occurs when a producer misrepresents his own goods or services as someone else's. See Dastar, 539 U.S. at 28 n.1.  "Reverse passing off" occurs when a producer misrepresents someone else's goods or services as his own. Id.

ORDER - 5

> If . . . the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of action — not for reverse passing off under the "confusion ... as to the origin" provision of § 43(a)(1)(A), but for misrepresentation under the "misrepresents the nature, characteristics [or] qualities" provision of § 43(a)(1)(B).

Dastar, 539 U.S. at 38.

A number of district courts have concluded that Dastar bars false advertising claims that are based on the inventorship of a product. For example, in Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 648, 652 (D. Del. 2006), the District of Delaware rejected a false advertising claim that the court concluded "merely rephrase[d] a reverse passing off claim." In that case, Monsanto had sued Syngenta, claiming that Syngenta had misappropriated Monsanto's patented technology — a "trait" in corn that tolerates herbicides — by using Monsanto's patented technology to develop its own herbicide-tolerant corn seed. Id. at 650. Monsanto also brought Lanham Act claims for reverse passing off and false advertising. Relying on Dastar, the court rejected Monsanto's reverse passing off claim because, it concluded, the Lanham Act only protects the tangible product sold in the marketplace (i.e., the seed), not the underlying patented trait. Id. at 651-52.

The court also rejected Monsanto's false advertising claim. Id. at 652. Monsanto had argued that Syngenta falsely advertised that the corn it sold was developed by Syngenta. The court concluded that Monsanto's false advertising assertions all related to the origin of the at-issue technology (i.e., the inventor) and did not relate to the "'nature, characteristics [or] qualities' of the corn seed." Id. at 653. As the court explained, "[a]ll of the [false advertising] statements asserted by Monsanto boil down to Syngenta's alleged passing off Monsanto's ... trait as its own. Such a claim, however styled, is barred by the language and holding of Dastar." Id.

Likewise, in Radolf v. University of Connecticut, 364 F. Supp. 2d 204 (D. Conn. 2005), the district court considered a researcher's claim that defendants had falsely attributed his data and findings as their own. The plaintiff conceded that Dastar foreclosed any claim he had for reverse passing off. But he argued that his claim was a false advertising claim, citing the language in Dastar regarding the viability of a false advertising claim "for misrepresentation under the

ORDER - 6

'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)." Id. at 222. The court rejected this "re-conceptualization" of plaintiff's reverse passing off claim:

> [Plaintiff's] effort to shoe-horn his claim into this language from Dastar is unavailing. For, at its core, [Plaintiff's] Lanham Act claim remains one in which he asserts that Defendants used research and data that he originated without properly attributing the source of the research and data. In short, [Plaintiff] asserts that Defendants passed off his research as their own. And that type of claim, however styled, is barred by the language and holding of Dastar.

Id.; see also Wilchcombe v. Teevee Toons, Inc., 2007 WL 294247 at *7 (N.D. Ga. 2007) ("To the extent that plaintiff's false advertising claim is really against defendants for passing off their work as their own and for improper authorship credit, plaintiff's claim is barred by Dastar."). These cases give effect to the reasoning underlying the Supreme Court's decision in Dastar — that the Lanham Act does not protect inventions or ideas:

> [I]n construing the Lanham Act, we have been careful to caution against misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright. The Lanham Act, we have said, does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity. Federal trademark law has no necessary relation to invention or discovery, but rather, by preventing competitors from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, and helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product . . . .

Dastar, 539 U.S. at 34. Given the purpose of the Lanham Act as articulated in Dastar, the Court agrees with the Monsanto and Radolf courts that Dastar bars a "false advertising" claim that merely restates a "reverse passing off" claim regarding the authorship or inventorship of a product.

The question here is whether Baden's false advertising claim is really a repackaged "reverse passing off" claim regarding inventorship of Molten's "Dual Cushion Technology." Baden argues that the heart of its claim is that "Molten is advertising its basketballs as having been made using 'Dual Cushion Technology' which is innovative, and exclusive and proprietary to Molten" and that such advertising is false and misleading. (Plf.'s Resp. at 2.) Whether a product is "innovative, exclusive, and proprietary," Baden argues, goes to the "nature, characteristics [or] qualities" of the product. See 15 U.S.C. 1125(a)(1)(B). Molten disagrees and argues that the adjectives "innovative, exclusive, and proprietary" all relate to the inventorship of the product, and that, therefore, Baden's

ORDER - 7

false advertising claim is indistinguishable from a reverse passing off claim regarding inventorship. The Court's analysis thus turns on the meaning of the words "innovative, exclusive, and proprietary."

Webster's Dictionary defines "exclusive" as "limiting or limited to possession, control, or use by a single individual or group" or as "single, sole." Webster's Ninth New Collegiate Dictionary 433 (1986). "Proprietary" is defined as "used, made, or marketed by one having the exclusive legal right." Id. at 944. Thus, the words "exclusive" and "proprietary" relate to ownership or control over something; the words presuppose that someone owns the product or good being described. In the context of this case, Molten uses the words "exclusive" and "proprietary" in its advertising to indicate to consumers that Molten, and no one else, owns and offers for sale its dual cushion technology. In contrast, Webster's defines "innovation" as "the introduction of something new" or "a new idea, method, or device;" "innovative" is defined as "characterized by, tending to, or introducing innovations." Id. at 624. Thus, whether something is "innovative" does not turn on who owns or offers a product. A product is "innovative" if it is new in comparison to other products; the person or company that owns or offers the product is irrelevant to whether the product itself it is innovative.

Given the different meanings of these words, the Court concludes that Baden's false advertising claim partially survives Dastar. Advertising that Molten's product is "exclusive" and "proprietary" to Molten does not relate to the "nature" or "qualities" of Molten's product, but to the fact that Molten invented and owns the basketball technology. As the Monsanto court explained, these kinds of false advertising statements "boil down to [Molten's] alleged passing off [Baden's] ... [technology] as its own. Such a claim, however styled, is barred by the language and holding of Dastar." See Monsanto, 443 F. Supp. 2d at 653. In contrast, any advertising indicating that Molten's "Dual Cushion Technology" is "innovative" or new relates, not to the inventor of Molten's basketball technology, but to the "nature, characteristics, [or] qualities" of the basketballs themselves. Dastar does not bar a false advertising claim based on Molten's advertising that its product or technology is

ORDER - 8

innovative. The Court thus grants in part and denies in part Molten's motion regarding Baden's false advertising claim.[3]

### III.   Geographic Misdescriptiveness

In the Court's previous order, the Court relied on two district court cases — <u>Boshei Enterprises Co., U.S.A. v. Porteous Fastener Co.</u>, 441 F. Supp. 162 (C.D. Cal. 1977) and <u>Alto Products Corp. v. Ratek Indus., Ltd.</u>, 40 U.S.P.Q. 1738 (S.D.N.Y. 1996) — in holding that "the failure to mark the country of origin is actionable under the Lanham Act." The Court concluded that Baden had raised genuine issues of material fact regarding Molten's failure to mark and therefore denied summary judgment on the issue. But the Court singled out a question that the parties had not addressed — "whether Molten itself is liable for any Lanham Act violation relating to geographic misdescriptiveness where it is not the distributor or the U.S. importer of these allegedly unmarked balls." (Dkt. No. 115., p. 7.)

In this motion, Molten raises two issues related to geographic misdescriptiveness. First, Molten argues that <u>Alto</u> does not support Baden's claim. In <u>Alto</u>, the Southern District of New York held that "failure to designate country of origin in violation of the Tariff Act violates § 43(a) of the Lanham Act as a matter of law." <u>Alto</u>, 40 U.S.P.Q. 1738 at *20. Molten argues that <u>Alto</u> is distinguishable because Baden cannot show here that Molten has violated the Tariff Act. This argument directly relates to the Court's previous decision and should have been raised as a motion for reconsideration. Because it is untimely, the Court will not consider this argument here.

But the Court will consider Molten's second argument — that Molten cannot be liable for any Lanham Act violation relating to geographic misdescriptiveness where it is not the distributor or U.S. importer of these unmarked balls. As the Court recognized in its previous order, Molten's European distributor, Fanavenue, purchases the basketballs from Molten before distributing them. Molten

---

[3] The parties also argue about whether the testimony of Michael Schindler, CEO of Baden, resolves any factual issues surrounding the allegedly false advertising. Because the Court's analysis is a legal, rather than factual, one, Mr. Schindler's declaration is not helpful to either party's argument.

ORDER - 9

argues that any country of origin marking requirement does not reach Molten where its participation in the transaction takes place wholly outside the United States.

Molten relies on a recent Supreme Court case discussing an exception to the general rule that U.S. patent law operates only domestically and does not extend to foreign activities. Microsoft Corp. v. AT&T Corp., 127 S. Ct. 1746 (2007). Microsoft concerned 35 U.S.C. § 271(f), which provides that patent infringement occurs when one "supplies ... from the United States," for "combination" abroad, a patented invention's "components." Microsoft is not factually on point; it is instructive only to the extent that it confirms the general rule that U.S. patent law does not apply extraterritorially. See Microsoft, 127 S. Ct. at 1758.

In Alto, the Southern District of New York confronted the same question faced here — whether a foreign company is liable for trademark violations when its product is exported to the United States through a foreign exporter without any country of origin marking. In Alto, an Israeli manufacturer sold products that were not marked with the country of origin through a U.S. distributor owned by the Israeli manufacturer. The Court held that the Israeli manufacturer could be held liable for the Lanham Act violation: "when a foreign manufacturer sells unmarked goods abroad to an importer, with knowledge that the importer will resell them in the United States without properly designating the country of origin, the manufacturer may be held liable for any resulting harm." Alto, 40 U.S.P.Q. 1738 at *20. In so holding, the court relied on prior Supreme Court precedent, in which the Supreme Court held that:

> liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.

Id. at *19 (quoting Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 853-54 (1982)).

Baden argues that under Alto, Molten may be held liable if it knew that its product would be sold in violation of the Lanham Act. Baden points to the deposition of Molten U.S.A. CEO, Kiyoaki

ORDER - 10

Nishihara, in which Mr. Nishihara stated that Molten knew that Fanavenue might sell unmarked basketballs to U.S. consumers. (Nishihara Dep., p. 272-73.)

Baden also cites Steele v. Bulova Watch Co., 344 U.S. 280 (1952) and Reebok Int'l v. Marnatech Enters., Inc., 970 F.2d 552 (9th Cir. 1992). In Steele, the Supreme Court held that the Lanham Act provides a "broad jurisdictional grant." See Steele, 344 U.S. at 286. But that case involved the extraterritorial reach of the Lanham Act where a U.S. citizen manufactured infringing products abroad and then sent them back to the United States. Steele is therefore distinguishable. In Reebok, the Ninth Circuit held that the district court had jurisdiction to hold a Mexican manufacturer, who was making and selling knock-off Reebok shoes, liable for Lanham Act violations. Reebok, 970 F.2d at 554-57. The court applied a three part test to determine whether the Lanham Act would apply extraterritorially: "first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." Reebok, 970 F.2d at 554. Because the defendant in that case organized and directed the manufacture of the counterfeit shoes from the United States and then sold them in Mexican border towns knowing that the shoes went back to the United States with regular frequency, and because sales of the counterfeit shoes decreased Reebok's legitimate sales in Mexico and the United States, the Court held that the district court had jurisdiction over Reebok's claims against the Mexican defendant. Id. at 557. Although Reebok makes clear that the Lanham Act may reach the activities of a foreign manufacturer, it does not address the precise question here, where the foreign manufacturer is one step removed from the distribution process.[4]

The Court concludes that Molten's sale of unmarked balls to Fanavenue is outside the jurisdictional reach of the Lanham Act. Even though Baden has presented evidence that Molten

---

[4] In addition, although Baden has cited Reebok in its brief, it has failed to apply the three-part Reebok test to the facts of this case. The Reebok analysis therefore has limited value to the Court's analysis.

ORDER - 11

anticipated that some balls would reach U.S. consumers, Molten has no control over where the balls it sold to Fanavenue are eventually sold. Unlike the foreign manufacturer in Alto who sold directly to a U.S. importer, Molten sells to a French distributor who then sells to consumers around the world through its website. Where those balls are eventually sold is wholly dependent on the individual consumers who purchase the balls through the FIBA website. Molten's portion of the transaction ends in France and its connection to the end consumer is tenuous. Molten therefore cannot be held responsible for any Lanham Act violation resulting from the lack of country of origin marking. Molten's motion for summary judgment on this issue is GRANTED.

**Conclusion**

The Court GRANTS IN PART and DENIES IN PART Defendant Molten's motion for summary judgment. The Supreme Court's decision in Dastar bars Baden's Lanham Act claim based on advertising that Molten's basketballs are "exclusive" and "proprietary" to Molten. But Dastar does not bar Baden's Lanham Act claim based on Molten's advertising that its basketballs are "innovative." The Court therefore grants in part and denies in part summary judgment to Molten on Baden's false advertising claim. Moreover, Molten is not liable for any failure to mark the country of origin on its basketballs, where Molten sells its basketballs to a French distributor without any country of origin marking, and that French distributor sells to consumers around the globe, including American consumers, via its website. Thus, the Court grants summary judgment to Molten on Baden's claim for geographic misdescriptiveness.

The clerk is instructed to send copies of this order to all counsel of record.

Dated: July _16_, 2007.

Marsha J. Pechman
U.S. District Judge